UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,     ) Fort Myers, Florida
                                 ) 
                                 ) Case 2:18-mj-1176-CM
Plaintiff                 ) 
                                 ) Tuesday, October 30, 2018
vs.                       ) 
                                 ) 2:33 p.m. to 3:42 p.m.
ERIN S. BROWN,        ) 
                                 ) Courtroom 6B
Defendant              ) 
_____) Volume One of One


TRANSCRIPT OF INITIAL APPEARANCE/DETENTION HEARING
HELD BEFORE THE HONORABLE CAROL MIRANDO,
United States Magistrate Judge


*Official Court Reporter:*
*Jeffrey G. Thomas, RPR, CRR*
*2110 First Street, Suite 2-194*
*Fort Myers, FL 33901*
*Telephone: (239) 461-2033*


*(Proceedings reported by Digital Recording Equipment.*
*Transcript produced using computer-aided transcription.)*

1                          **A P P E A R A N C E S**

2

   COUNSEL FOR PLAINTIFF:
3

4                          United States Attorney's Office
                           Middle District of Florida
                           United States Courthouse
5                          2110 First Street
                           Room 3-137
6                          Fort Myers, FL  33901
                           (239)461-2200
7                          BY:  YOLANDE G. VIACAVA, ESQ.

8

   COUNSEL FOR DEFENDANT:
9

10                         Duncan Law Office of Zena X. Duncan
                           5660 Strand Court
                           Naples, FL 34110
11                         (305) 754-5011
                           BY:  ZENA X. DUNCAN, ESQ.

12

13 ALSO PRESENT:

14                         TAD PARKS, Probation Officer

15
                                  *  *  *
16

17

18

19

20

21

22

23

24

25

1          **I N D E X**

2     **October 30, 2018**                          **Vol.**      **Page**

3     Preliminary Discussions                      1            4

4     Argument by Ms. Viacava                      1            6

5     Argument by Ms. Duncan                       1            18

6     Further Argument by Ms. Viacava              1            25

7     Further Argument by Ms. Duncan               1            29

8     The Court Questions Ms. Taylor               1            33

9     Ms. Viacava Questions Ms. Taylor             1            36

10    Ms. Duncan Questions Ms. Taylor              1            36

11    Order of Court                               1            38

12    Final Discussions                            1            43

13    Certificate of Court Reporter               1            45

14                              *  *  *

15

16

17

18

19

20

21

22

23

24

25

1        * * * P R O C E E D I N G S * * *

2                        – – –

3        THE COURT:  Call the next case, please.

4        COURTROOM DEPUTY:  Calling Case 2:18-mj-1176-CM,

5   United States of America versus Erin S. Brown.

6        MS. VIACAVA:  Good afternoon.  Yolande Viacava

7   representing the government.  And with me at counsel table is

8   Special Agent Scott with the FBI.

9        MS. DUNCAN:  Good afternoon, Your Honor.  Zena Duncan

10  on behalf of Erin Brown, who's present here next to me, in

11  custody.

12       THE COURT:  All right.  Thank you.

13       We are here for a detention hearing.  The government

14  has requested detention based on serious risk of flight, and,

15  Miss Duncan, you asked for a hearing.  In the meantime, the

16  United States District Court from the Northern District of

17  Alabama, Jasper Division, has returned an indictment against

18  Ms. Brown based on the charges in the criminal complaint, so I

19  thought we would do an initial appearance on that indictment.

20       Have the parties received a copy of the indictment?

21       MS. VIACAVA:  Yes, Your Honor.

22       MS. DUNCAN:  Yes, Your Honor.

23       THE COURT:  All right.  Is that acceptable regarding

24  with the initial on the indictment?

25       MS. DUNCAN:  Yes, Your Honor.

1          MS. VIACAVA:  Yes, Your Honor.

2          THE COURT:  All right.

3          MS. VIACAVA:  The indictment charges, in Count 1, on

4 or about the dates of September 7, 2018 until the present,

5 within the Northern District of Alabama and elsewhere, the

6 defendant, Erin S. Brown, did corruptly attempt to obstruct,

7 influence, and impede a foreseeable official proceeding, to

8 wit, a proceeding in the Northern District of Alabama, before a

9 court of the United States and a federal grand jury, involving

10 Erin S. Brown's conduct relating to healthcare fraud, wire

11 fraud, and mail fraud, by requesting repayment of a $10,000

12 payment paid by Erin S. Brown to Prescriber Number 22, a

13 doctor, so that both parties could deny the original purpose of

14 the $10,000 payment, and by requesting that Prescriber

15 Number 22 $1,500 to assist Erin S. Brown's flight from the

16 United States to a foreign country for purposes of avoiding the

17 official proceeding, in violation of Title 18, United States

18 Code, Section 1512(c)(2).  This offense carries a maximum term

19 of imprisonment of 20 years, a fine of up to $250,000, a term

20 of supervised release of not more than three years, and a $100

21 special assessment.

22          THE COURT:  All right.  Thank you.

23          Miss Brown, do you understand the charge against you

24 in the indictment?

25          THE DEFENDANT:  Understand, but the last portion

1    is . . . .

2              THE COURT:  Just whether you understand the charge

3    against you.

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  Okay.  And do you understand the

6    potential penalties?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  Okay.  And did you receive a copy of the

9    indictment?

10             MS. DUNCAN:  We have a copy, Judge.  She has not had

11   her own copy.  This is a copy that was handed to me by the

12   government today.

13             THE COURT:  All right.  You'll give it to her then?

14             MS. DUNCAN:  Correct.

15             THE COURT:  Okay.  Thank you.

16             All right.  Are the parties ready to proceed to the

17   detention hearing?

18             MS. VIACAVA:  Yes, Your Honor.

19             MS. DUNCAN:  Yes, Your Honor.

20             THE COURT:  All right.

21             MS. VIACAVA:  May I approach the podium, Your Honor?

22             THE COURT:  Yes, please.

23             MS. VIACAVA:  Your Honor, the government has

24   consulted with the Assistant United States Attorney that's

25   prosecuting this case in Alabama; and, as a result, looking

1   through the facts contained in the criminal complaint, the

2   government would be seeking to have this individual detained as

3   a serious risk of flight.

4          The government would proffer that, on or about

5   July 19th, 2017, that this defendant was served with a target

6   letter from the United States Attorney's Office in the Northern

7   District of Alabama.  They were given -- they sent her the

8   target via e-mail because they did not have a fixed address for

9   her.  She would not provide them with one, and they were not

10  able to locate one.  She agreed to accept it via e-mail.  They

11  indicated -- that target letter informed her that she was a

12  target of a criminal investigation into her conduct relating to

13  healthcare fraud, wire fraud, and mail fraud.

14         At the time, the Northern District of Alabama was

15  conducting an investigation into her involvement with a company

16  by the name of Global . . . where she worked as a sales

17  represent, located in Florida, from approximately July of 2015

18  until late December, 2015.

19         So after she was given that target letter, told what

20  the investigation involved, and she was informed that she was a

21  possible defendant in the case, they still were not able to

22  find her physical whereabouts were unknown; and up until the

23  time that she was located here, in Florida, her whereabouts

24  were still unknown.

25         She began communicating with them on or about

1   July 19, 2017.  She would send them messages indicating that

2   she'll been out of the country within the next three to six

3   months, but she's not sure when she's even leaving, that's a

4   vacation she's planned for.  That was the information that she

5   kept providing to them although she would not give them

6   specifics or provide a fixed address for herself.  In fact,

7   when pretrial services spoke with her, she was still unable to

8   provide a fixed address.

9           Additionally . . . .  And after that target letter

10  was given to her in July of 2017, within approximately one

11  month, she did, in fact, leave the United States.  In fact, she

12  has had extensive travel outside of the United States.  She

13  left the United States on August 30th, 2017.  She arrived in

14  Qatar.  She returned to the United States on October 27th,

15  2017, to San Francisco, from New Zealand.

16          The FBI was able to pull her travel history that just

17  shows where she left out of and where she returned to.  It

18  doesn't show where she went during the timeframe that she was

19  unaccounted for outside of the United States.

20          After she returned, on October 27, 2017, to San

21  Francisco, she left again on December 19th, 2017.  She went to

22  the Island of Tahiti.  And then she returned again, March 21st,

23  2018, to Los Angeles, flying in from New Zealand.

24          She left the U.S. again on June 10th --

25          THE COURT:  I'm sorry.  Can you repeat that?

1    March 21st, 2018, she returned to the U.S.?

2            MS. VIACAVA:  She returned to Los Angeles from New

3    Zealand.

4            THE COURT:  All right.

5            MS. VIACAVA:  And then she left again, on June 10th,

6    2018.  She flew to Norway.  And then she just returned on

7    August 10, 2018.  She flew into Florida from London.

8            And that was just since she received that target

9    letter that she was gone for this lengthy period of time.  And

10   she still could not provide a fixed address.  And, prior to

11   that, her travel history included April 3rd of 2015, she had

12   gone to Turks and Caicos, as well as November 24th of 2016, she

13   had gone to New Zealand.

14           When she returned to the United States on August 10th

15   of 2018, when she flew into Orlando, that's where the cases

16   she's currently charged with, the charges that are pending,

17   stem from.

18           When she returned, she started communicating with a

19   particular doctor that was also under investigation, and in

20   early September of 2018, so shortly after she returned, she

21   began initiating text conversations where she texted the

22   doctor, saying, "Having to go to court over this entire BS," to

23   which the doctor they refer to as M.F. indicated, "Best of

24   luck.  Have faith."

25           On September 7th of 2018, she initiated another text

1   message with the doctor in which she wrote, "So I need a favor

2   or something.  I need some money."  And she had a little money

3   signal.  "They are offering me quite a large amount to do

4   something, and it's not what I'm wanting in the slightest, but

5   I do need help.  If you can help me and we can square things

6   up, I will be in town in person until tomorrow or the following

7   day if you want to meet me for a drink.  I'm not joking.  This

8   is not something we should be playing around with.  I am

9   stressed to the max."

10          After receiving no response from the doctor, she then

11  texted, "Call me tomorrow.  It's urgent."

12          On September 7th, 2018, after forwarding the text

13  message to the government, the cooperating doctor consented to

14  make a recorded telephone call with the defendant.  It had been

15  proffered already that the doctor expected cash kickbacks from

16  this defendant in return for writing prescriptions.  That was

17  the nature of their relationship that the government had been

18  advised of.

19          So on or about September 7 of 2018, the doctor made a

20  consensual recorded telephone call to the defendant in which

21  the defendant advised that she was out of the country for the

22  last few months, "Trying to avoid this fiasco, as I have the

23  FBI calling all my friends and family."  She advised that she

24  went to Europe, New Zealand, and Southeast Asia.  So clearly

25  she knew that she was under investigation at the time.  She

1  admits in her texts that she was trying to avoid these legal

2  troubles.

3       The defendant then asked the doctor if he had heard

4  what was going on.  She stated that a bunch of people have

5  taken plea deals, and one person might have been sentenced to

6  seven years.  So she was well aware that there were numerous

7  individuals that were facing legal difficulties because of

8  their courses of action.

9       She responded -- she then stated, "Long story short,

10  I need to get that money back, or else we are going to be in a

11  world of," and it says, "Yeah."

12       The defendant told the doctor that it was not worth

13  losing his medical license over.  When she advised that she

14  wanted to have a clear conscience, and that was the wisest

15  decision, the doctor stated, "The ten grand that you gave me."

16  She responded, "Yes.  And then I won't have to lie about

17  anything."

18       The defendant then attempted to set up a time to meet

19  the doctor to get the money the following week.  The defendant

20  concluded that she does not want to go to prison.

21       So, again, all of her actions, her traveling, she was

22  well aware she's under investigation.  Her actions in leaving

23  the country, her statements she made when she returned, the

24  fact that she's asking for money, is all -- it goes towards a

25  risk of flight.

1      Again, it goes on further that, on or about

2 September 13, 2018, the defendant, during another conversation

3 with the doctor, she admitted that she and another Global sales

4 representative had been communicating about the investigation.

5 She stated that the FBI were calling her friends, her mom, and

6 the guy that she used to date.  The defendant stated that the

7 guy that she used to date did not tell the FBI anything because

8 he was a good friend.

9      So again, she was aware that they were looking for

10 her.  She was aware before she left the country that she was

11 the target of an investigation.

12      The defendant went on to state that she cannot get a

13 job in the medical field since Global is on her resumé, and

14 when potential employers look Global up, they see that Global

15 is under investigation.  So she was well aware that her

16 employer, other individuals that worked for the organization,

17 were involved in legal troubles as well, that she had already

18 heard what happened to some of them.

19      On or about October 14th, 2018, again through text

20 messages, she indicated, "I'm just not going to be the only one

21 who gets screwed on this matter."

22      On October 20th, 2018, the defendant texted to the

23 doctor, "I need to borrow 1500."  Since he wouldn't pay the

24 10,000, she dropped it down to 1500.  "And it's serious.  I

25 would not ask if I knew another friend to ask.  Not trying to

1    pull anything on you, but if it all goes through, I'll leave

2    (unintelligible), and it will all be in the past.  Plus, I will

3    go to New Zealand for good.  This can be just between us.  No

4    returning."

5            So again she is referencing wanting money so she can

6    leave the country.  She's indicating she'll be in New Zealand

7    for good.  Again, goes towards her being a flight risk.

8            On or about October 20th, 2018, the defendant texted

9    the doctor a copy of her target letter followed by the text,

10   "This lady will not stop calling me."  So again, well aware.

11   Her purpose of trying to leave the country, her purpose for

12   being outside the country, was to evade law enforcement.

13           On October 22nd, 2018, at the direction of the

14   government, the doctor sends the defendant the following text:

15   "Hey there.  Good possibility I can get you the money Friday.

16   Will that be okay?"  She responded back, "I can come today or

17   tomorrow.  Wednesday would be pushing it."

18           From talking with law enforcement, the thought behind

19   her trying to get the money as quickly as possible, she had

20   plans to leave as quickly as she could.

21           And ultimately the defendant's conduct relating to

22   the healthcare fraud, the wire fraud, the mail fraud, in

23   connection to Global Compounding Pharmacy, she requested that

24   repayment of the $10,000 paid by her to the doctor so that both

25   parties could deny the original purpose of the $10,000 payment;

1    and by requesting $1,500 from the doctor to assist her in

2    flight from the United States to a foreign country for purposes

3    of avoiding official proceedings, that is what she's being

4    charged with since she's been back in the country since August

5    of 2018.

6                In addition, at the time that law enforcement located

7    her, it appears that she was living out of her car.  She had

8    pillows in the car, she had bedding in the car, she had bottles

9    of alcohol in the car.  She could not provide them with an

10   address of where she had been staying.

11               In addition, the car that she was driving was not

12   registered.  She told law enforcement she had bought it

13   recently.  The tags on the car were not assigned to that car.

14   Again, the fact that the vehicle was unregistered, the tags

15   assigned to the vehicle were unassigned to that particular

16   vehicle, all indicative of trying to avoid law enforcement.

17   The best she could do was she said that she was staying with

18   friends, although again it appeared that she had been living

19   out of her car.

20               Looking at the pretrial services report, when she

21   talked with pretrial services, she could not provide them with

22   a fixed address there.  She couldn't even provide them with the

23   last name of her friend that she said was Erin that she had

24   been staying with.

25               She provided information saying that she had been

1    working up in the panhandle of Florida.  She has no ties to the

2    Middle District down here.  She certainly doesn't appear to

3    have ties to Alabama.  She told pretrial services that, for the

4    past 18 months, that she traveled around Europe for vacation

5    purposes with her girlfriend, and she advised that her passport

6    was in Destin, Florida.

7            She advised that . . . what she provided pretrial

8    services was that she had to vacate after a few weeks the

9    apartment that they had rented in Destin, Florida, and she

10   advised that she was transient and she resided at different

11   addresses owned by her friends.

12           Again, based on the texts and the statements she made

13   to the doctor, this would all be something to allow her to

14   avoid law enforcement.  She made multiple statements about the

15   FBI looking for her, reaching out to family members, trying to

16   track her down, and she continued moving around.

17           She indicated that she resided with her grandmother

18   on occasion in a residence in Tampa, Florida, and she had told

19   them that she had been working part-time for a rental

20   inspector.

21           And even the name of where she said she had been

22   working, pretrial services had to do a little research, and

23   found a name similar enough that they tried to reach out to

24   that business, and they were not able to get confirmation as to

25   whether or not she had ever worked there.  But certainly she

1    was in the Middle District of Florida, not in Destin, and she

2    indicated she was living out of her car, and her text messages

3    indicate that she was planning to travel back to New Zealand

4    when she received money to travel.

5           She indicates that -- under finances, that her

6    liabilities include approximately $40,000 outstanding credit

7    card debt.  That appears to be how she was able to leave the

8    country and travel for the last 18 months while avoiding law

9    enforcement.

10          She indicated that she did not consume alcoholic

11   beverages.  However, there were approximately three liquor

12   bottles that had been opened that were found in her vehicle.

13          She did admit to using cocaine, heroin, and Xanax,

14   and she indicated that she used it on a monthly basis.  She

15   noted her last usage was October 24th, 2018, which was when law

16   enforcement came into contact with her.  She indicated that

17   that is when she . . . that she had used heroin daily up until

18   October 24th, when she was arrested; and, in fact, she tested

19   positive for cocaine and opiates when pretrial services did the

20   urinalysis.

21          Based on the strength of the government's case in the

22   Northern District of Florida, based on her activities of

23   reaching out to another individual that she believed would be

24   under investigation, the fact that she sent the message

25   indicating that, if he gave her the money that she'd given him

1    as a kickback, that they could both tell law enforcement it was

2    for a different purpose, the fact that she indicated that she

3    was going to go back to New Zealand, she was going to leave

4    this behind her, the fact that she texted she understood, she

5    then communicates with other people working for Global, and

6    she's aware of what's happened to some of these individuals,

7    and she wanted no part of it, based on her behavior of leaving

8    the country within approximately a month of getting the target

9    letter, not having any general plans, and coming back and

10   forth, but again not living with a fixed address, not

11   contacting law enforcement when she came back into the country

12   on those multiple occasion, even knowing that they were looking

13   for her, we would argue that she's a serious risk of flight,

14   and we would ask that she be detained.

15           Even if she were to surrender her passport, that

16   would not be sufficient, since she is moving from house to

17   house, she is in a car that wasn't registered to her, that

18   didn't have plates assigned to it.  She would still have the

19   ability to continue to live transient, as she has told pretrial

20   services she was living, and she's made it quite clear that she

21   doesn't want to deal with, in her words, "This fiasco".  She

22   doesn't want to deal with the FBI, she doesn't want to deal

23   with this, and she had plans to leave.

24           So the government would argue that, based on the

25   nature of the charges, based on the evidence of the case, based

1   on her own statements, and how she was living, and the fact of

2   her rapid travel, and her brief periods of time staying in the

3   United States, we would argue that she is a substantial risk of

4   flight, and we would ask to detain her and have her transported

5   to Alabama to face these charges.

6            THE COURT:  All right.  Thank you.

7            Miss Duncan.

8            MS. DUNCAN:  Yes, Your Honor.  Thank you.

9            So, Your Honor, the complaint does allege, obviously,

10  some of the information that was just relayed to the Court by

11  the Assistant United States Attorney.  However, in here are

12  snippets of, I guess, these conversations via text message that

13  went on with the cooperating witness doctor, and that's as they

14  put down here, referred to him as.

15           However, I think one of the issues that the Court

16  should consider is that this target letter, when it -- when and

17  how it was sent to Miss Brown.  So initially she receives --

18  you know -- word of her being an interested party in an

19  investigation that's going on into this Global Pharmaceutical

20  company that she worked for via e-mail.  And so when it's sent

21  to her, her understanding from the letter itself was that we

22  are trying to make communications with you, this is the only

23  way we know, we have an e-mail address for you, which somehow

24  had been provided to them, and that, you know, we'd like to

25  know where you actually reside so we can send you a formal

1    letter.

2            So, at the time, Miss Brown was about to start her

3    plan to travel, and which she did respond back to them and

4    state to them that she had these plans.  At the time she was --

5    had just finished leaving her residence that she had in Saint

6    Petersburg, Florida, where she owned a house, and she had sold

7    it, and her plans were actually to travel throughout the next

8    two years of her life.  That's what she was doing because she

9    was -- she was let go from Global.  She was not working a

10   steady job at that point, and she had an interested girlfriend

11   that she had been seeing who was from New Zealand.

12           So a lot of the travel was with her and to her, which

13   they had already planned prior to any of this going on.  And

14   her understanding, certainly, was that she wasn't to,

15   obviously, disappear, she was eventually going to have to

16   answer to whatever questions or information the government was

17   seeking based on this target letter that they sent to her; but

18   at the time she didn't have an address to give.

19           Prior to her leaving, and throughout the course of

20   her time that she is coming in and coming out, and traveling,

21   and such and so forth, she was staying with her grandmother,

22   who's actually present today, at her home, which is in Tampa,

23   but off and on.  She didn't really have a residence.  She

24   didn't really have a place to stay.  The government was aware

25   of this house, they were aware of grandma living there, they

1    were aware of that address.  In fact, she even informed.  I

2    disagree that she didn't give pretrial services any address.

3    She informed them of the grandmother and where she was staying

4    prior to her arrest off and on, and it was that exact address

5    on Cascade Lane in Tampa, Florida.

6         So I think -- I'm not going to argue the merits

7    necessarily of the case and the evidence that she has against

8    her, but I do think that it's important for the Court to know

9    that, at the time that she was making these decisions, based on

10   the charges she's been charged with, she did not understand

11   that that meant that she needs to turn herself over to the

12   United States Government, that she did e-mail and communicate

13   with them, that these are the plans that I have.  I'm already

14   doing this, I'm about to leave to go on this trip for a couple

15   of months.  I have plans abroad for the next extended period of

16   time that was already planned.  And they were communicating

17   with her.

18        It's not that they didn't have any contact or

19   communication with her at all.  They did.  What they were

20   seeking, though, she didn't have at that moment.  All she

21   really had is a residence -- and she's a resident of Florida,

22   and was born here, mostly lived most of her life here -- was

23   grandma's address in Tampa, who, again, had been, I guess, her

24   sense of stability since the time that she did sell this house

25   in Saint Petersburg and has been kind of moving around and

1    transient.

2           You know, in the midst of that, she lost her father,

3    who apparently was an individual that I would say was

4    extremely, extremely close to her, and it took a significant

5    toll on her ability to be the person that she had been prior to

6    all of this happening, which was someone that has a bachelor's

7    degree, went to a four-year college, had a scholarship to play

8    softball, very bright girl, was not a drug addict or a drug

9    user, who had jobs, who had sales people seeking her because

10   she was good at what she did.  It just all went awry when she

11   lost her and dad, and then she lost her way basically.

12          So we're here today.  So the purposes of this hearing

13   before Your Honor, at least now, for the Court to consider, is

14   whether or not she can reside at the -- whichever she chooses

15   to do, actually here in Florida, and do so under the Court's

16   conditions to either go make her appearances in the court in

17   Birmingham, Alabama, where the Northern District of Alabama is;

18   or, if she chooses to have the case transferred here, and

19   that's what the authorities decide to do, here in Fort Myers,

20   Florida.

21          It's our contention that there's several conditions

22   that the Court can impose that would allow her to remain at

23   liberty without getting into trouble or, you know, picking up

24   any new arrests, or cases, engaging in any drug activity, being

25   homeless or transient, not being able to be a stable individual

1   who either has a job, stays at home, you know, does the things

2   that you're supposed to do as a responsible citizen or member

3   of the community.

4          And I think that the fact that she's got a lot of

5   family in Florida -- today she's got her grandmother, who is

6   here, and her aunt, who is her father's sister, who is also

7   present, and they both reside here in Florida.

8          Doris Taylor is her grandmother.  She's in Tampa.

9   And Karen Matson is her aunt who lives outside of Orlando.  And

10  they're just two of the many numerous members of her family

11  that reside here.

12         As I stated before, she is willing to undergo

13  whatever order and conditions that the Court imposes.  I don't

14  think that there is an issue as far as giving her conditions

15  that would make her stay.

16         The risk of flight, certainly I understand the

17  government's contention as it relates to her travel abroad; but

18  again, at that time, in her mind, she didn't understand that

19  she wasn't allowed to leave.  She'd already honestly conveyed,

20  in the communications initially, and in the subsequent ones

21  with the government, that she already had plans to leave.

22         She does hold a U.S. passport.  I actually have the

23  passport here today.  This was in Destin, Florida, that she

24  told the pretrial services officer at the time that they did

25  her interview, and it was with her friend that she was staying

1    with at that time, who is the same individual who is her

2    girlfriend, who is from New Zealand.  She was able to mail this

3    and send it to her.

4           Now, at the time they questioned, when they were

5    living in Destin, Florida, they were renting an apartment from

6    an individual who they found out was spying on them.  They

7    essentially had, according to my client, cameras in the home

8    that were peeping on them, and so they decided to leave there.

9    And then they had to just kind of be wherever they could be.

10           And her passport was in her items, or her luggage,

11    which is with her girlfriend, and that's how we obtained this

12    passport, because she failed to send it to us in order for us

13    to show the Court and her willingness to surrender this

14    passport so that she's not going to be able to travel out of

15    the country, obviously, during the times and the conditions

16    that she's under order from the court, and that she's not

17    willing to do that and wanting to do that.  She is very much

18    about trying to answer to and resolve this case.

19           I think that the fact that she needs some treatment

20    is a benefit to the Court's contention that she could gain that

21    by being outside versus inside, in custody.  I think that she

22    is already well aware of the fact she does have a drug problem.

23    She's well aware that, lately, based on where she was living,

24    her house has not been her first priority; but she's wanting to

25    do that now, and be able to be focused on this case and getting

1   better.  I think the Court certainly can impose conditions that

2   would allow her to do that, and allow her to seek counseling

3   and treatment as she needs.

4          What I'm proposing to the Court is -- again, I'm

5   Court appointed, so money is an issue.  It's not that she has

6   means.  She does have this $40,000 worth of credit card debt

7   she has to repay at some point or get a civil judgment against

8   her on a credit report.

9          But her grandmother is retired, she's 84 years old,

10  she is very much wrapped up into her church, and she is a laity

11  of the church.  So most of her time, most of her energy, goes

12  into church council, and giving to the community, and putting

13  fund-raisers on, such and so forth such as that.  She lives

14  with her husband, who is grandpa, and he's still retired, but

15  working now as a truck driver after his retirement.  So that is

16  the bulk of the income to their home.  She owns the home.

17         Also living there is her other grandson, who is a

18  recent college graduate.  None of these individuals are

19  negative people.  They are positive individuals.  They are not

20  convicted felons.

21         Ms. Taylor is willing to take responsibility for her

22  granddaughter, and to help her find her way again, per se.  And

23  I'm asking the Court to allow her to be released as a

24  third-party custodian to her grandmother.

25         They don't have a lot of money, so a monetary bond is

1    not going to be something that is likely going to be able to be

2    met; but I think there are other conditions that the Court can

3    impose that wouldn't necessarily be needed.

4              And if you wanted to hear from any of the family

5    members, Your Honor, they are here to talk to the Court.

6              THE COURT:  All right.  Thank you.

7              MS. DUNCAN:  Thank you.

8              THE COURT:  Ms. Viacava, did you have anything else?

9              MS. VIACAVA:  Yes, Your Honor.  In response to --

10             THE COURT:  Briefly, please.

11             MS. VIACAVA:  Yes, Your Honor.

12             Defense counsel made statements that her client just

13   didn't understand everything.  However, it was provided to her

14   in writing on July 19th.  In that target letter, it informed

15   her that she was a target of criminal investigation into her

16   conduct.  It also indicated that she's a possible defendant in

17   the case.  They asked about her physical whereabouts.  It says

18   it was unknown.  And it details that they asked her repeatedly

19   for her physical whereabouts.  It was unknown.

20             It goes on further, this is the part that I did not

21   provide to the Court before, that, on August 2nd of 2017, that

22   the defendant e-mailed a financial affidavit to HHS/OIG agent

23   in an attempt to have counsel appointed to represent her as a

24   target of an ongoing investigation.  So she took another step

25   to understand the significance of what she was involved with.

 1   She was told that the original affidavit would be needed for

 2   court, and to provide the address, and they provide the address

 3   where to send the original.

 4          Well, she never sent the financial affidavit.  That

 5   was on August 2nd, 2017.  Instead, from looking at her travel

 6   history, that's when she took off to -- on August 30th of 2017,

 7   she went to Qatar.  And she was gone until she returned on

 8   October 27th of 2017, when she flew to San Francisco.  She

 9   didn't contact law enforcement then, but what is contained in

10   the -- in this report details . . . Paragraph 23, Page 8 --

11          THE COURT:  What report are you referring to?

12          MS. VIACAVA:  The criminal complaint.  It details

13   that her actions -- she was out of the country for the past

14   several months, and in a quote to the doctor is, "Trying to

15   avoid this fiasco, as I have the FBI calling my friends and

16   family."  So she was well aware that they were looking for her.

17          So to have her attorney stand in front of the Court

18   saying she just didn't understand, she was well aware that --

19   they had already reached out to her, she knew . . . and then

20   there were further -- she had told the doctor that she had

21   traveled to Europe, New Zealand, and Southeast Asia.

22          She also, on September 8th, 2018, had texted the

23   doctor, as part of a series of texts.  She said, "Did you know

24   that this is the largest medical insurance fraud investigation

25   ever?  I had no idea.  The pharmacy is the one is on

1    (unintelligible)".  So she was aware it was a very large-scale

2    investigation.

3              On September 13th, she again tells the doctor that

4    the FBI are calling her friends, her mom, the guy that she used

5    to date.  So they were going through great efforts to locate

6    her.

7              She even, on October 20th of 2018, although she had

8    done all this traveling, she was still able to provide a -- she

9    texted a copy of her target letter to the doctor, saying that

10   they would not -- "This lady will not stop calling me."  So

11   again, it was made clear.

12             So her statements, when she indicates to him that

13   she'll be gone if she gets that money, "Plus, I'll be in New

14   Zealand for good," makes it clear that she planned on taking

15   the money and being able to leave the country, and she didn't

16   plan on returning.  Those were her own statements that she

17   made.

18             So we would argue that she is a flight risk.  Her

19   family was aware that law enforcement was looking for her based

20   on her own statements.  She was not contacting them on any of

21   the return trips that she made back into the country on

22   multiple occasions.  Instead, she was seeking a way to get out

23   of the country.  So we would argue that she is a risk of

24   flight.

25             In looking at the factors that the Court, in

1  Title 18, United States Code, Section 3142, the Court can

2  consider the nature and circumstances of the offense charged,

3  and the Court can consider the weight of the evidence against

4  the person, as well as the history and characteristics of the

5  person.

6         In this particular instance, we would ask that the

7  Court take into consideration the fact that she was aware that

8  she was under investigation, she was aware her employer was

9  under investigation, and her response was to leave the country,

10  by her own statement, to, "Avoid the fiasco."  And her plans,

11  even when she came back most recently, in contacting another

12  witness, and trying to get that money, she indicated she was

13  planning on leaving again overseas, but this time it was for

14  good.  So she wanted to collect the money, and she wanted to

15  leave.

16         And just based on how law enforcement found her,

17  living out of her car -- defense counsel talked about her being

18  transient, her grandmother had been living in Tampa for a

19  lengthy period of time, and yet that was not her purpose.  She

20  did not want to provide that address.  She did not want to stay

21  here and face these charges.  She wanted to leave.  And she

22  made that clear in her text messages as well as her travel

23  history and her actions.  So this wasn't just a vacation,

24  because she kept coming back, and she would stay for a very

25  brief period of time, but she would leave again.

1          And as her statements indicated, she was still

2    keeping up with people to find out what was happening with

3    this.  So she was well aware, besides getting her own target

4    letter, by her own statements, she was talking to other people,

5    and finding out people had taken plea deals, what they're

6    facing for sentencing, and what was happening.  So she was very

7    well aware of the nature and circumstances of the

8    investigation, and she chose to avoid law enforcement.

9          We would ask that, based on her actions of trying to

10   change a witness's testimony by saying to them hey, you give me

11   back the money, we can both deny what the money was given for,

12   indicates that she is a risk of flight, and we would ask that

13   she be detained.

14          MS. DUNCAN:  Judge, may I briefly respond?

15          So I want to clear up the fact that --

16          THE COURT:  Why don't you come on up to the podium.

17          MS. DUNCAN:  Oh, I'm sorry.  I didn't realize I

18   wasn't there.

19          I want to clear up the fact that that's what she's

20   being charged with.  So that is the charge, exactly every

21   single thing that was just argued is why she's here.  She's

22   been indicted for that.  So clearly that's the point as it

23   relates to that.

24          What I am saying is she doesn't understand what it

25   means to be the target.  I'm talking about a target letter.  At

1   that time when it was sent to her, that means she can't go

2   anywhere?  If she's telling them -- in her mind she was telling

3   them I've got all these plans to go places, no one is saying to

4   her you're not allowed to go, you're not permitted to go, she

5   went.

6           Whether that was erroneous or not, again, that's what

7   she's being charged with.  I'm not up here arguing at trial

8   that she's not guilty and should be acquitted of the charges in

9   the indictment or the charge in the indictment.  So all that

10  goes to why she's here.  We understand that.

11          The issue before the Court right now is whether or

12  not she can reasonably deal with whatever conditions Your Honor

13  imposes, and do it successfully, that she will reappear before

14  this Court, or the court in Alabama, without any violations,

15  without committing any more -- you know -- wreaking any havoc

16  or anything on society that the government is purporting that

17  she's done thus far, and whether or not she's going to have

18  help to do that.

19          I mean, I am here with the family members that are

20  willing to take responsibility for her.  Again, this is all

21  prior to today, so everything argued, yes, that's her history

22  prior to today, prior to why she's being charged with what

23  she's being charged with.  On today's date, though, we have the

24  family that's been here.  They're not aware of what's going on.

25          So whether the family's being contacted or not

1   contacted, however they're being contacted -- because again,

2   that's just what's being alleged.  They don't know.  And people

3   that don't do this everyday do not understand what it is to be

4   the target of an investigation, to be responsible for answering

5   to the Court.  They're not lawyers.  They don't have legal

6   advice that runs through their veins, and they understand it

7   rationally when they hear about it.  So the family did not

8   until I spoke to them and made sure that they understand the

9   gravity of the situation.  They do now, which is why they're

10  here.  She has ties to this community.

11          She does need help.  She's asking the Court for help.

12  I don't think secured detention is going to help her.  I think

13  that's going to make matters worse.  I think that, now that

14  she's being charged with things that relate to (unintelligible)

15  the prosecution of this case, she's here, and she's going to

16  answer for it.

17          I think she should be given an opportunity to be able

18  to answer for it on the outside.  She has no priors, she's not

19  a convicted felon, she doesn't have anything pending or

20  outstanding anywhere else other than this Court, so her main

21  focus can be the responsibility of coming back to this court,

22  doing what she's supposed to do out there, having people help

23  her do what she's supposed to do.  And if the government is

24  concerned about her stepping foot out of the house, put an

25  ankle monitor on her.

1    She's willing to surrender her passport, so clearly

2    her days of travel throughout the world are done, and she

3    wouldn't be able to leave through an airport without a

4    passport.

5    So I'm asking the Court to fashion conditions that

6    she will abide by, that she's saying that she will abide by, by

7    my representation.  Speak to her family if Your Honor wanting

8    to ask any further questions.  But she's got people who are

9    good people that reside right here in this jurisdiction --

10   outside the jurisdiction, but here in Florida, that can take

11   responsibility for her, and I think the Court can give her a

12   condition that would allow her to be released.

13   THE COURT:  You're proposing that she go live with

14   her grandmother?

15   MS. DUNCAN:  Yes, Your Honor.

16   THE COURT:  And that's in Tampa?

17   MS. DUNCAN:  Yes, Your Honor.

18   THE COURT:  And that's Miss Taylor?

19   MS. DUNCAN:  Yes, Your Honor.

20   THE COURT:  Miss Taylor is here?

21   MS. DUNCAN:  Yes, she is.  She's right here.

22   THE COURT:  Would you like to come up, please?

23   DORIS TAYLOR:  Yes, Your Honor.

24   THE COURT:  Good afternoon.

25   DORIS TAYLOR:  Good afternoon.

1          THE COURT:  Could you please raise your right hand

2    and be sworn?

3          COURTROOM DEPUTY:  Please raise your right hand.  Do

4    you solemnly swear or affirm the testimony you will give will

5    be the truth, the whole truth, and nothing but the truth?

6          DORIS TAYLOR:  Yes, I do.

7          COURTROOM DEPUTY:  Please state your name for the

8    record.

9          THE COURT:  What is your full name, ma'am?

10         DORIS TAYLOR:  Doris M. Taylor.

11         THE COURT:  Okay.  Miss Taylor, you are the

12    grandmother of the defendant?

13         DORIS TAYLOR:  Yes, I am.

14         THE COURT:  Okay.  And I think -- I hate to ask a

15    lady her age.  You look very good if you're the person that

16    they're referring to as 84?

17         DORIS TAYLOR:  Yes, they did.  Yes.

18         THE COURT:  You look terrific.

19         You're not working; correct?

20         DORIS TAYLOR:  No.

21         THE COURT:  And I understand you are involved with

22    your church?

23         DORIS TAYLOR:  Yes, I am.

24         THE COURT:  And then are you there daily, or are you

25    home at times, or what's your general schedule on a daily

1    basis?

2          DORIS TAYLOR:  I'm at home.  I do some activities,

3    but I'm at home basically most of the time, yes.

4          THE COURT:  And you're there with your husband?

5          DORIS TAYLOR:  Yes.

6          THE COURT:  And do either of you have any prior

7    felony convictions?

8          DORIS TAYLOR:  No.  No, ma'am.

9          THE COURT:  Okay.  If I were to release your

10   granddaughter to your third-party custody, do you understand

11   what that means?

12         DORIS TAYLOR:  Yes, I do.

13         THE COURT:  And do you understand that would mean

14   that, whatever conditions that I impose, if you were to find

15   out that she had violated any of those conditions, you would

16   need to turn her in?  Do you understand that?

17         DORIS TAYLOR:  Yes, I am.

18         THE COURT:  And do you own your home there?

19         DORIS TAYLOR:  Yes.

20         THE COURT:  And if I were to impose a financial bond,

21   and ask you to co-sign that bond with the understanding that,

22   if your granddaughter violated any conditions, you could

23   forfeit that bond, would you be willing to do that?

24         DORIS TAYLOR:  Yes.

25         THE COURT:  Were you aware that your -- were you in

1   touch with your grandmother -- with your granddaughter when she

2   was traveling?

3          DORIS TAYLOR:  She contacted me, yes.  Occasionally.

4          THE COURT:  Okay.  Were you aware that your

5   granddaughter has been using heroin and Xanax on a daily basis?

6          DORIS TAYLOR:  No.

7          THE COURT:  Were you aware that she was the target of

8   a criminal investigation?  Federal criminal investigation.

9          DORIS TAYLOR:  No.

10         THE COURT:  Was your granddaughter residing with you

11  for the past three months?

12         DORIS TAYLOR:  In the past few months did you say?

13         THE COURT:  Yeah.  On occasion.

14         DORIS TAYLOR:  Yes, she came and stayed with me

15  occasionally.

16         THE COURT:  How occasionally?

17         DORIS TAYLOR:  She might stay a week and then be gone

18  for a while, maybe a few weeks.  So kind of came in and out

19  there.

20         THE COURT:  Did you know where she was when she

21  wasn't with you?

22         DORIS TAYLOR:  I had a general idea.  She would -- I

23  think she would tell me where she was.  I wouldn't have an

24  address usually, but I would know approximately where she was.

25         THE COURT:  Were you aware she was living out of her

1  car?

2          DORIS TAYLOR:  I didn't know she was living out of

3  her car.

4          THE COURT:  All right.  Thank you, ma'am.

5          Any other questions from counsel for the government

6  or Miss Duncan?

7          MS. VIACAVA:  Just one question, Your Honor.

8          You said you lived in Tampa; correct?

9          DORIS TAYLOR:  Yes.

10          MS. VIACAVA:  And you know these charges are out of

11  the Northern District of Alabama?

12          DORIS TAYLOR:  Yes.

13          MS. VIACAVA:  How would your granddaughter be able to

14  appear in court in the Northern District of Alabama?

15          DORIS TAYLOR:  I don't know.  I'm not sure.

16          MS. VIACAVA:  Thank you.

17          DORIS TAYLOR:  Florida would be better.

18          MS. VIACAVA:  Okay.  Thank you.

19          MS. DUNCAN:  If I may ask something as it relates to

20  that?  I don't know that she understood it.

21          DORIS TAYLOR:  No, I guess I didn't really.

22          THE COURT:  Can you put the microphone in between you

23  so I can pick up Miss Duncan too?

24          MS. DUNCAN:  Okay.  So I don't think she understood

25  the question, Judge.  That's why I'm just going to ask her to

clear it up.

I think what was being asked is, is there a way in which for her to get to Alabama?  She has to go to court in Alabama.

DORIS TAYLOR:  Oh, yes.  Yes.  I could take her up there.  Yes.  I misunderstood.  I thought you meant back and forth and back and forth.

THE COURT:  Well, if she had to appear for a court appearance in Alabama, would you ensure that she got there?

DORIS TAYLOR:  Absolutely.  Absolutely.  Yes, ma'am.

THE COURT:  All right.  Thank you.

DORIS TAYLOR:  Sorry about that.

MS. DUNCAN:  No; that's fine.

Judge, would you like to hear from Miss Matson, who is her aunt, as well, who helps to support --

THE COURT:  Is she in the same -- live in the same area?

MS. DUNCAN:  She lives outside of Orlando.  She doesn't live with her mother.  This is her mother.  She does not live with her mother, but she's another member of the support system she has here.

THE COURT:  Okay.  No; I'll accept your proffer, and I appreciate you being here, familiar.

MS. DUNCAN:  Thank you, Your Honor.

THE COURT:  All right.  I'm going to take a brief

1  break, and I would like to recess, and I'll talk with pretrial.

2                (At 3:21 p.m., court was recessed.)

3                          AFTER RECESS

4                (At 3:32 p.m., court was reconvened.)

5         THE COURT:  All right.  We're back on the record in

6  Case 2:18-mj-1176.

7         So I've heard the respective arguments of counsel.  I

8  appreciate that.  I've read the documents and the pretrial

9  services report, and I've heard the testimony of the

10 defendant's grandmother; and here I find that there are, in

11 fact, conditions that the Court can fashion that will

12 reasonably assure the appearance of the defendant should she be

13 released, and so I am going to order her released on such

14 conditions.

15        So I'm going to set an unsecured bond in the amount

16 of $50,000.  That will be co-signed by the defendant's

17 grandmother, Miss Doris Taylor.  In addition, Miss Taylor will

18 be the third-party custodian of Miss Brown, and Miss Brown will

19 reside with Miss Taylor at her address that was noted in the

20 pretrial services report.

21        And I don't know if I confirmed that with you,

22 Miss Taylor, but the address that we have is 14039 Cascade

23 Lane, Tampa, Florida, 33618.  And she's nodding her head, so --

24        MS. DUNCAN:  That's correct, Your Honor.

25        THE COURT:   -- that's the correct address?

1          MS. DUNCAN:  Yes.

2          THE COURT:  All right.  And so Miss Brown is to

3    reside with her.  She will report as directed to pretrial

4    services, and she'll start here in the Fort Myers Division, and

5    Officer Parks will start the process, and then Miss Brown will

6    need to report to the Tampa office, Miss Duncan, and

7    Miss Taylor, tomorrow.

8          And, Officer Parks, by what time?

9          MR. PARKS:  (Unintelligible).

10         THE COURT:  All right.  So Officer Parks will tell

11   you.

12         You're to surrender the passport, and we can do that

13   today, since Miss Duncan has it, and obtain no new passport or

14   travel document.

15         You're to maintain, Miss Brown, or actively seek,

16   verifiable employment.

17         You are to refrain from any unlawful possession or

18   use of a narcotic drug or controlled substance unless otherwise

19   given written approval, if you have a legal prescription, by

20   your pretrial services officer.

21         You will abide by the restriction of residence which

22   I have set already.  You will be restricted to your

23   grandmother's residence.

24         Your restriction on travel will be the Middle

25   District of Florida, I think the Tampa Division.

1     Is there any reason why -- I guess I don't know where

2     this prosecution is going to be.  If it's going to continue --

3     and I want to talk to you about that, Miss Duncan, as to

4     whether you're going to transfer that here.  I think I talked

5     to your client about the transfer rights in the initial

6     appearance.  But at the moment I'll just make it the Middle

7     District of Florida, and then travel between the Middle

8     District of Florida and the Northern District of Alabama.

9     She'll participate in a program of inpatient or

10    outpatient substance abuse testing, education, or treatment, if

11    deemed visible by pretrial services, and pay a portion of the

12    fee as determined by pretrial service, and submit to any method

13    of testing required by pretrial services for determining

14    whether the defendant is using a prohibited substance,

15    including random frequency urine testing, etcetera.

16    She is to submit to electronic monitoring and home

17    detention, which means you are restricted to your grandmother's

18    residence at all times except for employment, education,

19    religious service, medical substance abuse or mental health

20    treatment, attorney visits, court appearances, court appointed

21    obligations.  You'll wear an ankle monitor with GPS.

22    I believe that these things will address the concerns

23    that the government has raised that you were traveling.  And

24    certainly you can't travel abroad, you can only travel in

25    between your grandmother's house and the Northern District of

1  Alabama.

2           These are the conditions that I believe will

3  reasonably assure your appearance given that you have no prior

4  criminal history and the substance of the charges that the

5  government is relying on (unintelligible) the underlying

6  charges in this case.  You are innocent and you are entitled to

7  that presumption of innocence in this detention hearing, and so

8  these were the conditions I'm going to fashion.

9           Now, Miss Brown, let me first ask you, do you have

10  any questions, or any -- any questions about the conditions I

11  have just imposed?

12           THE DEFENDANT:  No, ma'am.

13           THE COURT:  And will you be able to abide by those

14  conditions?

15           THE DEFENDANT:  Absolutely.

16           THE COURT:  All right.  Well, let me tell you what

17  will happen if you do not abide by those conditions.  And your

18  grandmother -- I'm sure you don't want to put this extra stress

19  on your 84-year-old grandmother of having to turn in her

20  granddaughter for not abiding by conditions.

21           But should you not abide by conditions, and either

22  your pretrial services officer, or your grandmother, or someone

23  else lets us know, first of all, it's a mandatory condition of

24  your release that you not commit any federal, state, or local

25  crime while you're on release, and so if you do, you can be

1  assured your bond will be revoked, and that there will be other

2  things that will happen.

3            So if you violate any condition of your release, a

4  warrant for your arrest will immediately issue, and you would

5  be subject to revocation of your release, and an order for your

6  detention would enter, and you could later be prosecuted for

7  contempt of court.  If you obstruct the administration of

8  justice, your offense level may be increased.

9            If you fail to appear, federal law provides various

10 penalties.  You may incur forfeiture.  Your grandmother would

11 incur a forfeiture of any security that was given up front, and

12 an additional criminal case of bail jumping could be

13 instituted.  And if you're convicted of a failure to appear,

14 there are maximum penalties for that, as well.

15           If you are convicted of a new crime while you're on

16 release for this alleged crime, the sentence imposed on that

17 new crime must be increased because you committed it while you

18 were on bond.  And if the new crime was a felony, there's a

19 mandatory ten-year term of imprisonment that must be imposed in

20 addition to the sentence for the new crime.

21           So, Miss Brown, do you understand the penalties for

22 violation of any condition of your release and failure to

23 appear?

24           THE DEFENDANT:  Yes, ma'am.

25           THE COURT:  All right.

1          Miss Duncan, I don't know whether you've been in

2   touch with the Court, but now, obviously, we've got an

3   indictment, so they'll want to get that set for arraignment.  I

4   don't know if the Court has already set that, but you'll want

5   to find that out --

6          MS. DUNCAN:  Okay.

7          THE COURT:  -- to make sure that your client appears

8   for that.

9          MS. DUNCAN:  Will do, Your Honor.

10         THE COURT:  All right.

11         All right.  We'll get that bond ready.

12         Anything further?

13         MS. VIACAVA:  Your Honor, due to the fact that she

14  had several bottles of alcohol in her car, would the Court

15  consider also adding refraining from excessive use of alcohol,

16  which are one of the potential release conditions that the

17  Court can fashion under Title 18, United States Code,

18  Section 3142?

19         THE COURT:  Yes.  Thank you.  Yes, I will do that as

20  well.  I'll add that as a condition.

21         THE DEFENDANT:  And, in addition, I had received

22  communication.  After we leave here today, I'll talk to the

23  prosecutor again in Alabama, but the information when I was

24  given a copy of the indictment was that they were going to --

25  if conditions of release were fashioned, they were going to ask

1   to stay the conditions of release, and they were going to seek

2   to appeal to the District Court.  I will check -- I will call

3   them immediately and find out if that is still the intent, but

4   that was the information --

5            THE COURT:  They can certainly appeal it if they

6   wish.

7            MS. VIACAVA:  I will relay all the conditions the

8   Court has fashioned and see if --

9            THE COURT:  Absolutely.

10           MS. VIACAVA:  Thank you.

11           THE COURT:  And they can file whatever they will.

12  Okay.

13           All right.  Anything else?

14           MS. VIACAVA:  No, Your Honor.

15           MS. DUNCAN:  No, Your Honor.  Thank you.

16           THE COURT:  All right.  We'll be in -- we've got

17  another case we need to hear, but we'll get this case -- get

18  the bond completed, and then we'll do that.

19                    -- -- -- -- -- -- -- --

20           (Thereupon, at 3:42 p.m., the above-entitled matter

21      was concluded.)

22                    -- -- -- -- -- -- -- --

23

24

25

1

2                         CERTIFICATE

3      I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

4   ACCURATE TRANSCRIPT FROM THE ORIGINAL DIGITAL RECORDING CREATED

5   DURING THE PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER.

6

7      Dated this 9th day of November, 2018.

8

9                         /s/ Jeffrey G. Thomas
                          JEFFREY G. THOMAS, RPR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25